WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deborah Walsh, | No. CV-15-02466-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Deborah Walsh's appeal of the Social Security Administration's decision to deny her benefits. (Doc. 1.) For the reasons set forth below, the Court remands for further proceedings.

**BACKGROUND**

On May 15, 2013, Deborah Walsh applied for disability insurance benefits and disabled widow's benefits, alleging a disability onset date of August 21, 2010. (Tr. 21.) Walsh's claim was denied both initially and upon reconsideration. (*Id.*) She then appealed to an Administrative Law Judge ("ALJ"). (*Id.*) The ALJ conducted a hearing on the matter on December 17, 2014. (Tr. 47.)

/ / /

/ / /

In evaluating whether Walsh was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[1]  At step one, the ALJ determined that Walsh had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 24.)  At step two, the ALJ determined that Walsh suffered from severe impairments of anxiety disorder and affective disorder.  (*Id.*)  At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments.  (Tr. 28–30.)

The ALJ then made the following determination of Walsh's residual functional capacity ("RFC"):[2]

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work that is simple, routine and repetitive in task, with only occasional and routine change in the work environment.  She should not have any in person public interaction, but can have superficial interaction with co-workers and minimal

---

[1] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing supplemental security income).  Under the test:

> A claimant must be found disabled if she proves:  (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations.  If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, . . . she is not able to perform any work that she has done in the past.  Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy.  This step-five determination is made on the basis of four factors:  the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

[2] RFC is the most a claimant can do despite the limitations caused by her impairments.  *See* S.S.R. 96-8p, 1996 WL 374184 (July 2, 1996).

- 2 -

>    interaction with supervisors.  However, she can still be in [the] vicinity of others.

(Tr. 30.)  The ALJ therefore found that Walsh retained the RFC to perform her past relevant work as a warehouse worker.  (Tr. 35.)  In the alternative, at step five, the ALJ determined that there were a significant number of other jobs in the national economy that Walsh could perform despite her limitations.  (Tr. 36–37.)

On October 7, 2015, the Appeals Council declined to review the decision.  (Tr. 1.)  Walsh filed the complaint underlying this action on December 4, 2015, seeking this Court's review of the ALJ's denial of benefits.  (Doc. 1.)  The matter is now fully briefed before the Court.  (Docs. 17, 18, 19.)

**DISCUSSION**

**I.   Standard of Review**

A reviewing federal court need only address the issues raised by the claimant in the appeal from the ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  Substantial evidence is "more than a scintilla but less than a preponderance."  *Id.* (quotation omitted).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Id.* (quotation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004).  This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).  However, the Court

"must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Nor may the Court "affirm the ALJ's . . . decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

**II.    Analysis**

Walsh alleges that the ALJ erred by (a) not finding Walsh disabled as a matter of law according to the RFC limitations; (b) not finding that Walsh's physical ailments constituted severe impairments; (c) giving little to no weight to the opinions of treating physicians Dr. Fierro and Dr. Hawks; and (d) rejecting Walsh's symptom testimony as not credible.

**A.    Application of RFC limitations**

The ALJ found that Walsh could perform work at all exertional levels, with certain nonexertional limitations. She limited Walsh to work that is "simple, routine and repetitive in task, with only occasional and routine change in the work environment"; additionally, she found that Walsh "should not have any in person public interaction, but can have superficial interaction with co-workers and minimal interaction with supervisors." (Tr. 30.) Walsh contends that this mandates a finding of disability.[3] She bases this on the text of Social Security Ruling ("S.S.R.") 85-15:[4]

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these

---

[3] Walsh also argues that the ALJ erred in formulating the RFC, by failing to consider certain limitations opined to by Walsh's doctors and reported by Walsh herself. (Doc. 17 at 12–13.) Of course, whether these limitations needed to be incorporated into the RFC depends on whether the ALJ properly rejected the doctors' opinions and Walsh's testimony. That point will be considered in the context of Walsh's challenges to those rejections.

[4] Social Security Rulings "do not carry the force of law, but they are binding on ALJs nonetheless." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (internal quotation marks omitted).

- 4 -

> basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

S.S.R. 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).

But a limitation to "superficial interaction with co-workers and minimal interaction with supervisors" does not necessarily constitute a "substantial loss of ability" to "respond appropriately to supervision, coworkers, and usual work situations" so as to necessitate a finding of disability under S.S.R. 85-15. The most natural reading of the ALJ's RFC is that Walsh retains the ability to respond appropriately in interactions with co-workers and supervisors, so long as those interactions are, by the nature of a given job, superficial and minimal, respectively.

This is supported by the testimony of the vocational expert. The vocational expert testified that a hypothetical individual with the limitations identified in the RFC could perform Walsh's past relevant work of warehouse worker, in addition to several other jobs in the national economy. (Tr. 62–63.) The ALJ therefore did not err in finding, based on the RFC, that Walsh could work.

**B.     The severity of Walsh's physical impairments**

The ALJ found at step two of the five-step analysis that Walsh had only two severe impairments: anxiety disorder and affective disorder. She noted that Walsh suffered from certain physical impairments, but found them not to be severe:

> The record shows the claimant also treated for physical impairments of headaches, gastrointestinal reflux disease, back pain, and carpal tunnel syndrome. However, the objective and clinical record does not show these conditions would impose significant limitations and/or shown to be managed medically. However the record fails to persuade the undersigned that these conditions would even minimally limit his [sic] ability to engage in basic work activity for a basis of twelve continuous months. While the claimant sought minimal and conservative treatment for these impairments, treating notes failed to mention of any significant complications, or side effects of these conditions (Exhibits 2F, 11F, 13F, 17F, 18F).
>
> In fact, all of these impairments were being managed medically and were amenable to proper control by adherence

> to recommended medical management and medication compliance. There is no evidence that these conditions imposed more than minimal limitation in the claimant's ability to perform basic work activities. Accordingly, these medically determinable impairments are non-severe.

(Tr. 24–25.) Walsh challenges this with respect to her neck pain and related headaches and upper extremity symptoms. (Doc. 17 at 14.)

"An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)). Put another way, step two is a "de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290.

That an impairment is not severe must be "clearly established by medical evidence." *Webb*, 433 F.3d at 687 (quoting S.S.R. 85-28, 1985 WL 56856 (Jan. 1, 1985)). The ALJ cites to a number of medical records to support her conclusion that Walsh's neck pain and related impairments are not severe. Nevertheless, the records cited do not support that conclusion.

State consultative examiner Dr. Briggs did, as the ALJ noted, find no "significant objective clinical" evidence of physical impairments. (Tr. 424.) But Dr. Briggs diagnosed Walsh with complaints of "generalized back pain," (*id.*), and noted that according to Walsh "[t]he pain is aggravated by lifting more than 15 pounds." (Tr. 422.) The ALJ cited portions of neurologist Dr. David Bliklen's records indicating that certain aspects of Walsh's neurological examination were unremarkable. But Dr. Bliklen also assessed Walsh as suffering from cervical spondylosis without myelopathy, brachial radiculitis, carpal tunnel syndrome, numbness/paresthesias, headache, and osteoarthritis. (Tr. 564, 569.) Treating physician Dr. Linda Motsch was unable to complete the musculoskeletal portion of a physical exam, because Walsh was "too sore"; she also noted numbness and tingling in Walsh's arms, and sometimes legs, which was "getting

worse."[5]  (Tr. 533.)  Another set of Dr. Motsch's notes indicate that Walsh's "depression worsens her chronic pain overall preventing her from being able to sit/stand or walk for any period of time."[6]  (Tr. 635.)  Dr. Motsch further noted that Walsh suffered from "neck pain," "headaches," and "tightness and spasm[s] all down her back," which physical therapy had made "significantly worse." (Tr. 637.) Records from an emergency room visit in April 2014 indicate that Walsh presented with neck pain exacerbated by certain movements, which was diagnosed as cervicular radiculopathy. (Tr. 643–46.) Thus these exhibits, cited by the ALJ, do not clearly establish that Walsh's physical impairments were not severe.

Moreover, the step two analysis must consider the record as a whole. *See Webb*, 433 F.3d at 687 (considering "ALJ's reasons for rejecting [a claimant's] complaints at step two . . . when balanced against [the claimant's] doctors' contemporaneous observations, some objective tests and [the claimant's] subjective complaints"). Other treatment records and Walsh's testimony similarly suggest that Walsh's neck pain, headaches and upper extremity symptoms qualify as severe impairments at step two. The ALJ did not consider, at step two, Dr. Jack Hawks's records reporting that Walsh suffered from "quite severe" neck pain and diagnosing her with brachial neuritis or radiculitis and cervicalgia. (Tr. 443–45.) Nor did the ALJ consider Walsh's hearing testimony as to several pain-related physical limitations. (Tr. 55–58.) The record as a whole "includes evidence of problems sufficient to pass the de minimis threshold of step

---

[5] The weight which the ALJ gave Dr. Motsch's opinions varied.  The ALJ gave little weight to Dr. Motsch's opinion with respect to Walsh's mental impairments, (Tr. 34–35), which Walsh does not contest.  At step two the ALJ cited some of Dr. Motsch's records, found in Exhibits 13F and 17F, in support of her finding that Walsh's physical impairments were not severe; while giving "little weight" to other notes of Dr. Motsch's found in Exhibit 17F.  An ALJ may not "pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." *Moreno v. Colvin*, No. 10-cv-403-TUC-AWT (CRP), 2013 WL 3805664, at *4 (D. Ariz. July 22, 2013) (quoting *Craig v. Astrue*, 269 F. App'x 710, 712 (9th Cir. 2008)).  Such "cherry-picking" is particularly inappropriate at step two, where the record need only include "evidence of problems sufficient to pass [a] de minimis threshold." *Webb*, 433 F.3d at 687.

[6] This is particularly important because ALJs must consider the effects of impairments in combination, not merely in isolation. *See Lester v. Chater*, 81 F.3d 821, 829–30 (9th Cir. 1995).

two," *Webb*, 433 F.3d at 687, and the ALJ therefore erred in determining that Walsh's physical impairments were not severe at step two.

The error, moreover, was harmful. A step two error may be harmless if the ALJ, in formulating the RFC determination, nevertheless considers "any functional limitations" that might be caused by the impairment. *See Burch v. Barnhart*, 400 F.3d 676, 684 (9th Cir. 2005). But here, in discussing the RFC, the ALJ simply acknowledged and dismissed Walsh's alleged physical impairments:

> Functionally, she stated her pain interferes with her ability to sleep and that she has difficulty picking things up due to the numbness in her hands. She alleged she is able to lift only 10–15 pounds. The credibility of her pain complaints was addressed at step two and found to be not fully corroborated by the evidence in the record.

(Tr. 31.) The ALJ did not otherwise account for these impairments in evaluating Walsh's RFC. Thus the ALJ committed harmful error in finding at step two that Walsh's physical impairments were not severe.

### C. Treating Physician Opinions

The opinion of a treating physician is given more weight than those of non-treating and non-examining physicians. *See* 20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Lester*, 81 F.3d at 830. If a treating physician's opinion is uncontradicted, an ALJ must provide "clear and convincing" reasons, supported by substantial evidence, to reject it. *Ghanim v. Colvin*, 763 F.3d 1154, 1160–61 (9th Cir. 2014). If a treating physician's opinion is contradicted, an ALJ must still provide "specific and legitimate reasons, supported by substantial evidence, to reject it." *Id.* Here, the ALJ gave "little weight" to the opinions of treating physicians Drs. Jose Fierro, Jack Hawks, and Linda Motsch. Walsh challenges this determination as to Drs. Fierro and Hawks.

Two initial points apply to both doctors. First, as there is no indication that the ALJ incorporated any of the treating physicians' findings into her opinion, the granting of "little weight" is functionally equivalent to a rejection. *See Garrison v. Colvin*, 759 F.3d

995, 1012–13 (9th Cir. 2014) (noting that "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it"). Second, the ALJ cited as contradictory opinion evidence the opinions of the State agency medical consultants, who "review[ed] the medical record in its entirety," but did not examine Walsh. (Tr. 33.) Although this contradiction alone does not suffice to reject the opinions of the treating physicians, it does mean that the ALJ need only provide specific and legitimate reasons for doing so. *See Andrews v. Shalala*, 53 F.3d 1035, 1040–42 (9th Cir. 1995).

### 1.     Dr. Jose Fierro

Dr. Fierro's opinion comes in the form of a questionnaire, completed on December 10, 2013. In it, Dr. Fierro opined to severe limitations in Walsh's ability to complete daily activities, respond appropriately to co-workers, and respond to customary work pressure; and a number of other moderate and moderately severe limitations. (Tr. 514–15.)

In rejecting the opinion of Dr. Fierro, the ALJ noted that any treating relationship was quite minimal; in fact, "the claimant saw this doctor once to establish treatment in December 2013." (Tr. 34.) The opinion questionnaire was filled out on the same day as this first visit. (Tr. 515, 526.) The ALJ also found that Dr. Fierro's opinions as to Walsh's limitations were not consistent with the record as a whole, took issue with his opinion being in questionnaire form, and noted that Dr. Fierro was not a mental health specialist.

It is appropriate to consider the length of a physician's treating relationship with a patient in assessing how much weight to give that physician's opinion. In fact, regulations suggest that a treating physician who only sees a claimant once is not entitled to more weight than a nontreating source:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight

than we would give it if it were from a nontreating source.

20 C.F.R. § 404.1527(c)(2)(i); *see also Allen v. Comm'r of Soc. Sec.*, 498 F. App'x 696, 697 (9th Cir. 2012) (finding that a treating physician's "limited treatment relationship with [the claimant] was a specific and legitimate reason to assign little weight" to the physician's opinion); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail or longitudinal view*."). That Dr. Fierro only saw Walsh once was therefore a specific and legitimate reason to reject his opinion.

Similarly, the ALJ did not err in rejecting Dr. Fierro's opinion for being in questionnaire form. It is error to reject a questionnaire, simply for being a questionnaire, when it is "based on significant experience with [the claimant] and supported by numerous records." *Garrison*, 759 F.3d at 1013. On the other hand, "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citation omitted). Here, Dr. Fierro himself had little experience and few records to support his opinion. Further, the ALJ specifically found that Dr. Fierro's opinion was inconsistent with other reports in the record. (Tr. 34.)

The records the ALJ cited as inconsistent with Dr. Fierro's opinion are capable of multiple interpretations. The records of Dr. David Bliklen report that Walsh denied anxiety and depression, (Tr. 564, 567), and was alert and oriented, with good memory, attention, and fund of knowledge. (Tr. 568.) The records of Jewish Family & Children's Services ("JFCS") likewise report that Walsh was "calm" and alert with good eye contact and a euthymic mood. (Tr. 614.) On the other hand, the JFCS records also report Walsh as saying that "every day is a fight to get out," (Tr. 608), and that she felt "like a walking zombie." (Tr. 625.) The JFCS records also rated Walsh's depression as an 8 or 9 on a 1–10 scale. (Tr. 609.) Nevertheless, it is the job of the ALJ, not this Court, to resolve conflicts in the evidence. *Andrews*, 53 F.3d at 1039. There is at least substantial

evidence to support her conclusion here. Therefore, she did not err in finding that the opinion of Dr. Fierro was not supported by the record as a whole, which also lends legitimacy to her rejection of the opinion as being in questionnaire form.

Finally, the ALJ noted that Dr. Fierro not being a specialist in mental health "further diminishes the credibility of his opinions." (Tr. 34.) This is a legitimate reason to consider in determining how much relative weight to afford an opinion. *See* 20 C.F.R. 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Here, there is no indication that the State agency physician to whose opinion the ALJ accorded greater weight was himself a mental health specialist; nevertheless, it was permissible to note Dr. Fierro's lack of specialization in conjunction with the other reasons the ALJ cited. *See Holohan v. Massanari*, 246 F.3d 1195, 1202 n.2 (9th Cir. 2001) (noting that "a treating physician's opinion on some matter may be entitled to little if any weight . . . if the treating physician has not seen the patient long enough to have obtained a longitudinal picture of the patient's impairments, offers an opinion on a matter not related to her or his area of specialization, and presents no support for her or his opinion on the matter" (internal citations and quotation marks omitted)).

In sum, the ALJ provided "specific and legitimate reasons supported by substantial evidence in the record" for rejecting the opinion of Dr. Fierro. *See Lester*, 81 F.3d at 830.

### 2. Dr. Jack Hawks

Dr. Hawks's opinion also came in questionnaire form. (Tr. 434–35.) In fact, as the Commissioner notes, it was the same questionnaire, and "assessed the exact same limitations" as Dr. Fierro's questionnaire, with the exception of the specific side effects noted. (Doc. 18 at 16.) As with Dr. Fierro, the ALJ rejected Dr. Hawks's opinion because it was not consistent with the record as a whole, was in questionnaire form, and authored by a family practitioner, rather than a mental health provider. As discussed above, the inconsistency with the record and the fact that Dr. Hawks was not a mental

health specialist are permissible factors to consider in determining the weight to which an opinion is due.

Unlike Dr. Fierro, though, Dr. Hawks did have significant experience with Walsh when he completed his opinion questionnaire. Walsh established care with Dr. Hawks on November 11, 2010. (Tr. 475.) The questionnaire was filled out two and a half years later, on May 3, 2013. (Tr. 435.) The record includes notes from fourteen separate visits. (Tr. 430–78.) But while there was a significant treating relationship, the ALJ rejected Dr. Hawks's opinion as inconsistent with Dr. Hawks's own treating records. This was a legitimate reason, and it was supported by substantial evidence in the record.

As the ALJ noted, Dr. Hawks consistently recorded that Walsh's anxiety, panic attacks and depression were well controlled by medication. (Tr. 443, 447, 451, 458, 461, 465, 468, 471.) Likewise, the ALJ noted that mental status exams generally showed Walsh to be "alert, oriented, [with] good insight and judgment, [a] calm, euthymic mood, no psychotic symptoms, normal speech, intact memory, with normal sensorium and behaviors." (Tr. 34, 445, 448–49, 452–53, 456–57, 459–60, 462–63, 466–67, 469–70, 472–73, 477.) This is not, as Walsh contends, the impermissible citing of "a few isolated instances of improvement" to justify a finding of non-disability. *See Garrison*, 759 F.3d at 1017 ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). Rather, the only records of Dr. Hawks indicating a more severe impairment were recorded on the same day as the questionnaire itself. (Tr. 430.) And this, the ALJ noted, appears to have been based on Walsh's subjective complaints rather than objective clinical evidence. It is permissible to consider this in assessing the weight to be given a treating physician's opinion. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

It was not error, therefore, for the ALJ to reject Dr. Hawks's opinion.

/ / /

D.   **Walsh's symptom testimony**

An ALJ must engage in a two-step analysis in determining whether a claimant's testimony is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). The ALJ must first "determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036. If she has, and the ALJ has found no evidence of malingering, then the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." *Id.* (quoting *Smolen*, 80 F.3d at 1281). If an ALJ finds that a claimant's testimony relating to the intensity of her pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. *See Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell*, 947 F.2d at 345–46 (internal quotation marks and citation omitted).

Here, at the first step, the ALJ concluded that Walsh's medically determinable impairments could reasonably be expected to produce her alleged symptoms. (Tr. 31.) However, at the second step, the ALJ found that Walsh's statements regarding the intensity, persistence and limiting effects of her symptoms were "not entirely credible." *Id.* The ALJ did not state that she found any evidence of malingering; thus, her reasons for rejecting Walsh's symptom testimony must be clear and convincing. *Lingenfelter*, 504 F.3d at 1036.

1.   **Activities of daily living**

The ALJ began[7] by stating that Walsh had "reported activities of daily living that

---

[7] Walsh argues that the ALJ's initial paragraph described Walsh's testimony as "not

- 13 -

are not quite as limited as one would expect, given the allegations of disabling pain and symptoms." Specifically, the ALJ noted that

> [t]he claimant lives alone and is able to care for her home and attend to her personal care, without significant difficulties. She prepares simple meals. She does household chores, such as dishes, dusts, vacuums, and laundry. She feeds and waters, and walks her pets. She is able to shop for groceries and drive. She is able to go out independently. She is able to pay bills, handle a savings account, and use a checkbook/money order. She spends time visiting with her daughter and grandchildren in her home, and rarely takes her grandchildren to the park. She socializes with her best friend on a weekly basis and speaks to her pastor friend on the phone, frequently.

(Tr. 31.) Daily activities that are "transferable to a work setting" may be used to discredit a claimant's testimony of work-preclusive symptoms. *See Morgan*, 169 F.3d at 600. But the Ninth Circuit has repeatedly cautioned that work-transferable activities cannot be considered without regard to the pace at which, and the environment in which, they are completed. *See, e.g.*, *Smolen*, 80 F.3d at 1284 n.7 ("[M]any home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *see also Morgan*, 169 F.3d at 600 ("If a claimant is able to spend a *substantial part of his day* engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." (emphasis added)).

The ALJ's opinion did not make this required consideration, and is misleading as to the frequency of several of the "daily" activities it cites. For example, the ALJ writes that Walsh "is able to shop for groceries and drive." (Tr. 30.) Walsh's precise testimony was that she could "drive to the store maybe twice a month if I have to." (Tr. 51.) She also said that she was unable to leave the house "six days a week" typically and that sometimes she couldn't "go out for two weeks." (Tr. 59.) She characterized her "typical day" as "consist[ing] of just trying to keep [her] anxiety level down and remembering to

---

supported by the evidence as a whole" and "inconsistent and unpersuasive," (Tr. 31), is an impermissibly amorphous reason to make an adverse credibility finding. The Court reads this paragraph as introductory to the credibility discussion and not as a separate reason that needs to be examined on its own merits.

- 14 -

take [her] medication, remembering to eat, things like that." (Tr. 51.)

The citation of Walsh's activities of daily living, when Walsh could not in fact carry these activities out on a daily basis, is not a clear and convincing reason to find her testimony not credible.

### 2. Treatment gaps and failure to take medication

The ALJ also cited gaps in Walsh's treatment and her failure to take her medication as evidence that her allegations were not credible. Unexplained failures to seek treatment or to follow a prescribed course of treatment may be considered in assessing a claimant's credibility. *See Lingenfelter*, 504 F.3d at 1040. However, "there are any number of good reasons" that may justify a failure to seek treatment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Social Security Rulings state, and the Ninth Circuit has emphasized repeatedly, that a claimant may not be penalized for failing to seek treatment as a result of a lack of resources. *See* S.S.R. 82-59, 1982 WL 31384, at *4 (Jan. 1, 1982); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999); *Smolen*, 80 F.3d at 1284. Walsh testified at the hearing that she had not been able to afford treatment until sometime in 2014. (Tr. 59.) The ALJ erred in citing a "treatment gap" in 2013 as a reason for discrediting Walsh's testimony without addressing Walsh's apparent lack of resources.[8]

The ALJ did not err, however, in discrediting Walsh's symptom testimony based on her noncompliance with prescribed medications. Though the record does indicate that Walsh did on at least one occasion request a reduction in her medication for financial reasons,[9] the ALJ did not cite that as a reason to discredit her. Rather, the ALJ pointed to two occasions where Walsh reported not having complied with her medication regimen.

---

[8] The ALJ also cited a supposed treatment gap between April 2014 and July 2014. (Tr. 32.) This is factually inaccurate, as the records indicate that Walsh saw Dr. David Bliklen during this time and remained on anti-anxiety drugs. (Tr. 563–69.) The ALJ specifically cited to these records elsewhere in the written opinion. (Tr. 32–33.)

[9] Dr. Hawks's records indicate that in April 2013, Walsh requested that her Hydroxyzine prescription be reduced from 50 mg to 25 mg because of cost. (Tr. 436.)

- 15 -

(Tr. 613, 625.) Walsh testified at the hearing that she sometimes had trouble remembering to take her medications. (Tr. 51.) The ALJ thoroughly documented the extent to which Walsh's medications, when taken as instructed, improved her symptoms. (Tr. 31–32.) It was not error for the ALJ to find Walsh not credible in her assertion of severe symptoms when Walsh also stated she simply forgot to take medications which would have been effective in alleviating those symptoms.

### 3. Inconsistencies with the record

The ALJ also cited various inconsistencies between Walsh's testimony and the record. Last year, the Social Security Administration issued S.S.R. 16-3p, superseding S.S.R. 96-7p. This ruling emphasizes that inconsistency between a claimant's allegations of disability and evidence in the record may not be used broadly to discredit the claimant's credibility but only insofar as the evidence contradicts a specific assertion relevant to the disability determination. *See* S.S.R. 16-3p, 2016 WL 1119029, at *10 (Mar. 16, 2016); *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.").

One inconsistency cited by the ALJ veers into impermissible impeachment. The ALJ found that Walsh "made inconsistent statements concerning her use of marijuana and alcohol." (Tr. 33.) She noted that Walsh had variously described her use of marijuana as "occasional," "only once a week," and "rarely used." (*Id.*) She also noted that while Walsh testified at the hearing that she had been sober from alcohol since December 15, 2013, but that treatment notes indicated she actually had her last drink on January 5, 2014. (*Id.*) The ALJ acknowledged that Walsh's past substance abuse itself had no bearing on the disability determination, but found that "the inconsistent statements further diminish [Walsh's] credibility." (Tr. 33.) This type of general impeachment is not permissible under S.S.R. 16-3p.

Other inconsistencies do bear directly on issues pertaining to the disability determination. The ALJ cited extensively to the record in noting that, when compliant with her medications, Walsh either saw improvement in her symptoms or at least remained stable. (Tr. 31–32.) As discussed above, this is a fair characterization. So, too, was the ALJ's summary of Walsh's mental status examinations as generally favorable. (Tr. 33.) These are clear and convincing reasons to find Walsh's testimony to the contrary not credible.

Less convincing are the ALJ's findings on Walsh's testimony regarding side effects. The ALJ cites a single instance of Walsh denying side effects, (Tr. 621), and finds her testimony of "[d]izziness, confusion, blurred—really bad blurred vision, and then insomnia" as *possible* side effects of medications, (Tr. 59), to be not credible. This is not convincing for two reasons. First, Walsh testified to suffering from these symptoms, but said she was unsure whether they were side effects of her medication or simply related to her anxiety disorder. (Tr. 59.) Second, it appears she was talking about different medications; in the record citation, she denied side effects while taking Cymbalta and Lamictal; during the hearing, she appears to have been discussing possible side effects from Hydroxyzine. (Tr. 58–59.)

The ALJ also noted that Walsh "testified to disabling anxiety, [but] denied any symptoms of anxiety or depression to her treating doctor in May and June 2014." (Tr. 32–33.) That treating physician, Dr. Bliklen, was a neurologist who treated Walsh for numbness, headaches, and joint pain, (Tr. 563), and not for anxiety or depression. That Walsh denied symptoms of anxiety or depression to him is still relevant, but falls short, on its own, of being a clear and convincing reason for discrediting her other testimony as to anxiety and depression for two reasons. First, Dr. Bliklen's records do indicate that Walsh was taking medications for her mental impairments—Cymbalta and Lamictal—in May and June 2014. (Tr. 563, 566.) Second, the record shows numerous other occasions on which Walsh did report anxiety and depression to her treating physicians, including both just prior to and soon after her appointments with Dr. Bliklen. (Tr. 538, 625.) The

- 17 -

Ninth Circuit has held that an ALJ may not "single[] out a few periods of temporary well-being from a sustained period of impairment" in discrediting a claimant's allegations of mental health symptoms. *Garrison*, 759 F.3d at 1018. Walsh's statements to Dr. Bliklen regarding her anxiety and depression, by themselves, simply indicate such a period of temporary well-being, and are not a clear and convincing reason to discredit her testimony.

### 4. Harmless error analysis

The ALJ cited a number of legally insufficient or factually inaccurate reasons to support her finding that Walsh was not credible. However, she reasonably summarized the evidence of the medical records and properly cited it as a clear and convincing reason to discredit Walsh's allegations to the contrary, and permissibly made an adverse credibility finding based on Walsh's failure to take helpful medications because of forgetfulness. In determining whether the ALJ's errors were harmless, the Court must ask not "whether the ALJ would have made a different decision absent any error [but] whether the ALJ's decision remains legally valid, despite such error." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162–63 & n.4 (9th Cir. 2008). Here, the ALJ permissibly used the record's evidence of effective symptom management through prescribed courses of treatment to discredit Walsh's testimony to the contrary. The ALJ's errors in the credibility analysis are therefore harmless and the ALJ's decision as to Walsh's mental impairments is affirmed.

## III. Remedy

There remains, however, the ALJ's error in dismissing Walsh's allegations of physical impairments at step two. The Ninth Circuit has set forth a three-part test to determine when it is appropriate to remand for benefits versus further administrative proceedings. First, a court must determine whether "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1100–01 (9th Cir. 2014) (citation and quotation omitted). Second, the court must determine "whether the

1  record has been fully developed, whether there are outstanding issues that must be
2  resolved before a determination of disability can be made, and whether further
3  administrative proceedings would be useful." *Id.* (citations and quotations omitted).
4  Third, if the court "concludes[s] that no outstanding issues remain and further
5  proceedings would not be useful, [the court] may . . . find[] the relevant testimony
6  credible as a matter of law" and remand for benefits. *Id.* (citations and quotations
7  omitted). When there are questions regarding the sufficiency of the record as a whole or
8  an ALJ's reasoning, "the proper course, except in rare circumstances, is to remand to the
9  agency for additional investigation or explanation." *Gonzales v. Thomas*, 547 U.S. 183,
10 185 (2006) (quotation omitted).

11 Because the ALJ erroneously found Walsh's physical impairments not severe at
12 step two, the record has not been fully developed. The remaining steps of the sequential
13 analysis must be conducted with respect to those physical impairments. The case is
14 therefore remanded for further proceedings. *See Treichler*, 775 F.3d 1090, 1106 (9th Cir.
15 2014).

16 **IT IS THEREFORE ORDERED** that the Clerk of Court remand this action back
17 to the ALJ for further proceedings and enter judgment accordingly.

18 Dated this 27th day of March, 2017.

Honorable G. Murray Snow
United States District Judge